Mr. Jett, you may proceed. I think everybody is getting settled here. Good morning, Your Honors. Adam Jett on behalf of the United States. And if I might save five minutes for a couple of things. OK, watch your clock. Thank you, Your Honor. May it please the Court. Defendants create and sell a substance, SVF, that they market as a cure-all for a range of diseases, what one defendant called liquid magic. But unlike others using similar treatments, they assert that they can do so without any FDA review for safety and efficacy. Their primary submission is that the Court should reject the conclusions of other courts that these products are drugs by urging what they admit is an atextual exception. That is foreclosed by the statute as originally written, which the Supreme Court has said is intended to have its entire breadth. And it is foreclosed by the statute as amended in 2016, which created an expedited pathway for drug approval for substances like this. In other words, presupposing that substances like this are drugs. And regardless, the creation and use of SVF is unlike anything that even today, let alone 1938, as my friends urged, would be considered surgery. Now, the practical concerns that my friends raise are addressed elsewhere. Those are addressed by a narrow regulatory exception called the Seam Surgical Procedure Exception. The 11th Circuit correctly held that that exception does not apply here. Defendants remove adipose tissue and they implant SVF. Therefore, they do not remove HCTPs and implant such HCTPs. I welcome the Court's questions. I'm wondering about their argument that you can't really label this drug in this procedure and what your response is to that. I didn't quite understand how you thought this could be treated as a drug as a practical matter. Sure, so first, just maybe to kind of frame and understand their argument, that nothing in the statute requires any kind of particular kind of labeling. And I think that may be exemplified by the fact that when they make that argument, they're citing a Wall Street Journal op-ed rather than the statute itself. The statute generally assigns to FDA the mission of sort of figuring out what the correct sort of labeling would be. Now, as a practical matter, this has worked out fine on the ground. I think we have some examples, it's maybe around page nine of our reply brief, of various patient-specific drugs, some made through a manual process, some, in fact, even involving autologous stem cells, where this has not been a practical problem. And I think maybe just to sort of clarify a little bit, the word labeling is a term of art in the FDCA. It does not just mean what we might colloquially think of as a label. It's not just kind of the sticker that you put on. You wouldn't just remove the adipose tissue, mix it all up, and then stick a label on it. You could accomplish that goal by other means. Well, obviously, I don't want to get ahead of FDA, of course, of what the labeling requirement. So they haven't established any labeling requirements for this particular thing that you're calling a drug? I think that's correct. So ordinarily, when FDA approves a drug, the approval will include kind of qualifications about what the labeling would be. The labeling can include things other than the sticker label, things like the instructions, discussing how it's created or used, or the dosage. As for a sort of physical label, if your honors are interested in an example, in our reply brief where we kind of identify some of these kind of newfangled cellular drugs, I apologize, you'll have to sort of click through a couple of links, but if you click through the links and kind of work into some of those approval packages, the drug called Zintelco may be the best example. You'll see a photograph of the label, the label as compared to the labeling. And just as a basic matter, again, I don't want to get ahead of FDA of what a label in this, if this sort of drug were approved, what it would look like, but oftentimes it will have, if nothing else, like the name of the product, the name of the patient, just sort of basic things that prevent just a mix-up. And the mix-up, I mean, even if it's being used in a clinic is a concern, but especially because remember, they're manufacturing some of their products in laboratories on the other side of the country. So even just having the patient's name, the dosage, what the substance is in it serves a kind of practical function. But again, just to be clear, what you may be picturing as the sort of label that's attached to a bottle of penicillin that you pick up at CVS is not anything that's required in the statute. And so it really would provide no basis for them to draw inference about what the word drug means when it's defined in the statute. So the other concern is how has the FDA, if this were to be considered a drug, how would it impose the good manufacturing processes in this process? Sure, so I think my answer to that question is gonna be pretty similar to the answer to the labeling question, which is, again, the statute does not require any particular set of manufacturing processes. This is accomplished by regulation. The existing regulations kind of speak in broad terms, but indicate that FDA can essentially sort of elsewhere, and normally that occurs through the approval process, make clear that kind of certain requirements for manufacturing are applicable or not applicable. And again, that's what's happened in the various examples that we cite in the reply brief. There's some trial testimony we cite, the trial testimony in the reply brief that discusses, again, obviously making no assurances on FDA's behalf, but sort of discusses how a manufacturing process might look, and among other things, why it is that it is at least kind of scientifically possible to provide certain verification that when you claim that the SVF actually includes a certain type of stem cell, maybe a certain quantity of stem cell, or kind of any other sort of claim that you're making, that there are at least some basic ways to test whether that's true. There are some basic ways to at least kind of try to accomplish the goal of making sure that you're creating the product that you intend to create. Your friend suggests that we ought not to decide this, and we should invoke the major question doctrine, because this is such an overreach by the FDA to regulate its stromal vascular fraction. How do you respond to that? Sure, you know, we addressed that at some length in the reply brief. I mean, frankly, the fact that they're pointing to the major questions doctrine, I think just kind of underscores both the textual and the conceptual weakness of the argument that they're making. I mean, you know, the Supreme Court has applied the major questions doctrine when you're looking at something that would entirely revamp the economy. We kind of worked through some of the key examples, you know, hundreds of billions of dollars of cost, keeping hundreds of, or maybe tens of millions of people kind of still in their homes. What we're talking about here is basically the opposite of that. I mean, it's a, you know, regulation of a very specific sort of product. And, you know, just to be clear, I think the Supreme Court has always made clear that the major questions doctrine is it's somewhat contextual. And in fact, the kind of classic application of that in the FDCA space would be FDA versus Brown and Williamson. And the various arguments that kind of counted against regulating tobacco, at least without kind of other drug indications, not as a drug in FDA versus Brown and Williamson are arguments that count in our favor here. Among other things, you do have a subsequent statute that explicitly presupposes that products of this type are drugs. This isn't the sort of product that kind of existed when Congress passed the statute and nobody thought would ever be regulated. I mean, instead, this is a new technology being applied to a statute. But the whole point, as the Supreme Court spelled out in the Bactodist case and in the Sullivan case, was that you were gonna have these kind of expansive definitions meant to address evolving science. And FDA, if it decides that it's unnecessary to regulate something, can then apply its scientific expertise and to paraphrase the Supreme Court in Sullivan, not regulate something unnecessarily. So we've been, oh, sorry. Go ahead. We've been talking about whether this is a drug, but can we shift to the same surgical procedure exception? Of course. So you didn't challenge the district court's finding that the cells are not altered. And so I think you need us to think that tissue is the right level to look at instead of cells for you to win on this. Am I right about that? Yes, I think that's correct. I mean, I guess I'd sort of append a footnote to that answer, which is, as we point out, because it's an exception, they have the burden to establish it. I don't think they've disputed that. Obviously, we have the sort of our deference argument in backup. So conceptually, they need to establish that they can meet the burden of showing that our interpretation is an unreasonable one. But your honor is, of course, correct. We have not challenged. I mean, they are somewhat hedged factual findings. The district court does later clarify. They don't change substantially, but we're not taking on those factual findings. Our argument is a legal one. And so I agree that you have two layers because you think it's unambiguous and then you go to our deference next. But can you start with why it's unambiguous? Because I'm having trouble seeing how we can really tell that this means tissue instead of cells. Sure. Well, so I think the way to understand it is not to think that it kind of necessarily means tissues or cells, but to kind of read that relevant sentence in context when it says remove HCTPs and implant such HCTPs. Obviously, just textually, that puts a focus on what is removed and that puts a focus on what is implanted. And as the agency said, I mean, if you read the regulations, it's a sort of somewhat unusual regulation and it's written in this very sort of practical question and answer type format. So just think of this in a very practical way. If you were in defendant's clinic watching this being produced, you would say they have removed adipose tissue, they have removed fat. And then if you kind of watched the manufacturer, the SVF, you would say they have put back something that's entirely different than that. Maybe I could just give your honors. I think they will probably get up and say, no, we removed cells and we put back cells. And there's a finding that the cells aren't changed and they didn't contest that. No, I mean, of course your honor's right that their view is that they're removing cells. And all I'm saying is just from a very sort of practical perspective, if you were just sort of watching this, I think kind of anyone ordinarily would say they've removed fat, even within the fat are some cells, by the way, as I think they don't dispute. They then end up creating, of course, cellular debris that was not itself removed. Maybe here's just a kind of practical example, just I think might be a useful way to wrap one's head around it. So skin grafting is the kind of classic application of the same surgical procedure exception. If you remove skin, you might wash blood off of it, you might trim the skin, but then you would return what anyone would say was skin. If instead you removed the skin and you dissolved it in a vat of acid and you skimmed off some portion of that slurry and then you centrifuged off that slurry and then you returned that, it would be very unnatural, as I think the 11th Circuit explained in their decision. It would just be very unnatural to say that what you had removed were whatever particular combination of cells and platelets and growth factors and, of course, cellular debris, which you created in the manufacturing process, that that's what you had removed. The sort of far more natural, just I think application of that sentence would be you remove skin and then you returned that kind of hypothetical slurry. But obviously, our argument does not depend kind of solely on that sentence. As we point out, the kind of context and structure and history and purpose of this regulatory structure sheds quite a bit of light on what that sentence means because, I mean, among other things, this is a complete exemption from the sort of rest of this regulatory structure and if you just look at what those other exceptions are, there are things like scientific research, commercial couriers, storage. So to interpret it in the way that my friends interpret it would be so incongruous with those other exceptions and it really would mean, I mean, it leads to a certain absurdity that I've never really heard my friends provide an answer to because it seems to mean that you can remove something, you can manipulate it, reorient it, I mean, frankly, probably in some science fiction way, take each individual cell, if you have the sort of scientific capability and rebuild something that, you know, no one would ever say ordinarily exists in the human body and as long as the thing that they end up putting back into the human body is composed of cells or I suppose cell debris that at some point came out of the human body. Isn't there also an enzyme added? There is an enzyme added as well. I believe there may have been some dispute at trial about whether any enzyme ends up getting returned to the body. I think the defendant's position is that that gets removed by the, I'm gonna mispronounce this word, but the centrifugation or however one pronounces that verb. But, you know, the fact that they are using an enzyme is, you know, again, just to take the court back to the 11th Circuit decision, I think that does illustrate why there's kind of so much transformation happening here. This is something so different from cutting or sizing or shaping. They really are turning one thing into another. But that whole argument, I think, depends on thinking that we're looking at the full thing taken out instead of just the cells within it taken out. So it seems like you're using a lot of expertise and explanation for the purpose that maybe comes in an hour deference, but I don't know if it's really unambiguous. Well, so, I mean, you know, look, to be clear, obviously we're happy to win on any round that we can win on, but I do want to explain why we think it's unambiguous, maybe not in the kind of colloquial way that one might use the word unambiguous, but in the way that the Supreme Court in Kaiser kind of uses the term, which is hour deference comes in once you've utilized every available tool of construction. So that is text, context, history, structure, sort of all of those available. But what the 11th Circuit said was this stromal vascular fraction solution is the product of an intensive cell isolation process involving enzymatic digestion that goes much farther than simple rinsing or sizing. And so it held that it's unambiguously not the same. That was the same, what was implanted is not the same as what was removed. That's correct. And maybe just to sort of pair up that point with the question that Judge Freeland was just asking, which is, it's not just that we are looking at the amount of manipulation and kind of broadly thinking, therefore, because it's so manipulated, we must be right and the other side must be wrong. I mean, I think that is a sort of fair way to think about how to apply the same surgical procedure exception. Often, if you are kind of applying a provision and a regulation, you would look at how the other provisions operate. But there's also a kind of textual element to that argument. I do just want to make sure I sort of have a chance to tease that out, which is ultimately you're trying to interpret the term such a CTP. And I mean, essentially the disagreement, at least the sort of textual disagreement here is how do you conceptualize the HCTP that was removed and the HCTP that was returned? And our answer to that question, as I was discussing before, is the sort of practical, you look at what you kind of immediately take out and you look at what you immediately take in. The other side's argument is you actually, they don't say it sort of follows automatically. They basically say one can choose, the surgeons or the manufacturers can choose what they want to kind of count as the relevant HCTP. And their view is that it can include sort of little small subcomponents within the sort of first order thing that you remove that can only be accessed through the sort of extensive chemical enzymatic digestion, just wordless, you quoted, that they're using. And given that there are so many other provisions of this regulatory structure that are very concerned about manipulation. I mean, this is, if you look through the drafting history from the original 1997 proposed approach on, and you look at how that middle tier of regulation works, where you're disqualified if there's too much manipulation, and you look at the other areas where there's no regulation at all. Again, areas where there's absolutely no manipulation. Those are all contextual clues, we think, that when you're kind of parsing what such HCTP mean, that it's wrong to think of such HCTP as whatever little subcomponent you could only access through all of those kind of chemical type steps. You wanted to save some time? I did, Your Honor. Thank you very much. May it please the Court, Nathaniel Garrett for appellees. I'd like to start where my friend left off on the SSP exception. This was an exception adopted 25 years ago, I think with some respect for the practice of medicine and surgery. 25 years on, the government is effectively rewriting the provision in a way that's inconsistent with the text, the purpose, and the history, and I'd like to talk about all of those. The reason the SSP exception applies here is because the cells that the physicians implant, the cells have to be the same as what was the same cells that were removed. Judge Friedland, as you noted, the difference between this case and any stem cell case that's come before is there was a trial where the prime factual dispute was whether those cells were the same as what were taken out. The district court concluded on the facts that it was, and that it hasn't been appealed. Now, admittedly, there is tissue that is, or there are parts that are taken out that are not put back in, sort of debris, but that's not a drug. It's not being used for the intention of treating a medical condition, so we don't need an exception for it. What we need an exception for is the cells. Now, the district court found that this exception applies just based on a plain reading of the statute, so that's where all, or the regulation, so that's where it all starts. I think it's the most... And so, are you trying to distinguish the 11th Circuit on this fact-finding? You're saying they didn't have such a fact-finding? I think the 11th Circuit still would've come out the same way with that fact, but I think it's important if you start to understand what the text of the regulation really provides. I think it's actually the most critical trial. Before we get there, I just wanna be clear that you are not arguing at all as to the other procedure where the patient goes away and you send out the adipose tissue to another place to get... Not for this exception. So, what was the finding below on that? As to this specific issue, the finding was the SSP, the single surgical procedure, applies to the same-day procedure, not the expanded procedure. Okay, and you're not appealing that? We're not appealing that decision. We have other grounds for the expanded cells, but for this, it's just the... Okay, so now you wanna look at the regulation? Yes, please. So, what it talks about is an established... It says the FDA won't regulate an establishment that removes HCTPs and implants such HCTPs into the same patient in a single surgical procedure. And I think at root, what we're really talking about is just two terms in that regulation, such and HCTPs. And what the district court did is it just said, well, let's look at what are the meaning of those two terms. Let's start with HCTPs. The definition of HCTPs includes both cells and tissues. And by the way, that's not just how the regulation is written now. There were four years where this regulation was in process, where the FDA was saying what it was gonna do. And time and again, they told us in the guidance document, in the proposed rule, this includes cells and tissues or cells or tissues. Includes both. So it can include cells or tissues. But couldn't that just be because sometimes all that is removed is an egg and it's a cell? So I think there's two problems with that, Your Honor. I mean, the first is there's no actual evidence that ovocytes can be removed. Somebody did testify ovocytes can be removed. There was no follow-up on that as to the fact of that. It's actually not true. But putting that aside, that would make- Well, isn't it true? Isn't that what IVF does? I think it still comes out with some tissue material. But even if that is right, Your Honor, that would make this an ovocyte and tissue regulation, which is rather odd. I mean, there's no indication in the regulatory history that what they were talking about, they intended to include eggs and tissues. Well, is there any indication that they meant something broader than eggs by cells? Well, no, other than they use the term cells repeatedly. And I think that would be odd if they just meant one cell. I mean, there are times when the FDA identifies certain types of cellular products or other bodily products. Even if we were to agree that there's some ambiguity, when you look at the text of the exception in isolation, how do you deal with the rest of the 11 circuits analysis that seem reading the regulation in context and all the things that the Supreme Court directed us to consider before deciding whether there's- Thank you, Your Honor, I think it's important. So I think the FDA is actually, their interpretation is not consistent with the purpose and the history of this regulation, and let me explain why. So I've talked somewhat about the history, but they're saying in the guidance documents that this was meant to be cells and tissues. But then you get to the word such, which is, according to the government, means in its original form, which only allows for certain types of processing, sizing, shaping, cleansing, rinsing. So the FDA gave two justifications for the SSP exception. They said there's a lesser communicable disease risk, and there's no risks associated with storage. That's true for our procedure. There's lesser communicable disease risk because it's autologous cells, and we don't store it. Okay, the FDA doesn't actually argue that. What they do is they change both of those purposes a little bit. So with communicable disease risk, they actually shift to more of a generalized surgical risk. They say, well, this surgery's different than other surgeries. There's sort of additional risks at issue. I think there's three problems with that, Your Honor. One, as I hope we've established, the sort of question of surgical risk is really outside the FDA's purview. They certainly have purview over communicable disease risk, but not generalized surgical risk. Two, the language they're relying on comes from the 1997 guidance document where it says we're accepting all these surgeries because the risk will generally be no different from those typically associated with surgery. What it does not say is what the FDA is arguing, which is, well, that gives us authority to sort of pick and choose between different surgeries, those that have general risk and those that don't. It's not saying that. It's saying generally, not always, but generally, if you're doing a procedure where you take cells or tissues, put them back in, generally the risk will be no different. So I think the text is against them. And finally, there was no evidence at trial that at least district court rejected the proposition that the risks are different. So that's the first purpose. The second, as I said, was storage. Well, again, the FDA doesn't argue there's a storage risk. What they change to is there's a processing risk. This is, I think, a really significant and important point to show how far the FDA has come. If you look at the table attached to the 1997 guidance document, it talks about handling and processing controls for cells and tissues. And it says, as to the SSP exception, those don't apply. Processing and handling is not relevant for purposes of the SSP exception. It's relevant everywhere else. Why doesn't that just imply they assume there would be no significant processing and handling when there's an SSP exception? Because they did impose limits on processing and handling in other contexts, Your Honor. I mean, it's not just that the FDA is telling us this isn't relevant for us. I think because it would intrude on the practice of medicine. But also because when they do care about processing and handling, they put it in the regulation. That's the 1271.10 Minimal Manipulation Regulation, right? That regulation says you are accepted, there's sort of a middle level of exceptions where there's a certain type of processing, right? Now, what the government is saying now is, well, actually, you could satisfy minimal manipulation, but not satisfy the SSP exception because our processing rules are stronger. I think that has it backwards in terms of saying we're going to impose stronger processing controls on SSP when we told you before they're not relevant. And we have this provision that says, that talks about the type of processing permitted. I mean, I think it's also somewhat inconsistent, Your Honor, their position about processing. I mean, their definition of such is in its original form. But I think my friend would concede that tissues and cells are never sort of in their pure original form when they go back in. I mean, there's always modification in some way. Well, which is why I think they're saying a minimal amount of processing or handling would be permitted. And that's fine if that's in the Minimal Manipulation Regulation, which is what it said. But our purpose here today, Your Honor, is to reconstruct the SSP exception's original meaning. And when it was originally enacted in 2001, they said processing controls are not going to apply. We're not going to impose processing limitations on the SSP exception. And then they have a separate one that does. I think there's several other problems with the government's interpretation I haven't talked about, we haven't talked about. One is the surplusage canon. We referred to it a little bit with whether I suppose it could be resolved a teeny bit if you say, well, this is an oversight and tissue regulation. But otherwise, they're reading cells out of the provision. Their answer to that is, well, this is a generalized HCTP definition. It applies everywhere. Fine. But again, if you look at the 1997 guidance, if you look at the proposed rule, it was written in a way to make clear it applied to cells or tissues. So it doesn't really account for the history to suggest that somehow in adopting the final rule, they really were just talking about tissues. And in terms of the 11th Circuit decision, I'll just hit on that, because I recognize that we have a conflicting decision, and I recognize we're asking the court to disagree with that decision. But I think there's good reason to do so. I mean, the three things I would highlight is one, the court said the most natural reading of such was in its ordinary form, which only allows for sizing, shaping, cleansing, and rinsing. Again, I think our position is that's not a natural reading. There's a dictionary definition of such that can be applied here. And that's... I mean, how do you... So you want us to say the only way such can be used here is to say that it is only referring to the cells and not the tissue. You're unambiguously, such means we're looking at the cells. Well, it means or. It means or. Depends on what the... As the sort of HCTP definition, I think, indicates, what really matters is what is the physician intending to implant, right? Sometimes they may be... The HCTP definition says articles consisting or containing cells or tissues that are intended for implantation. So it's not the intent, it's what the object is, right? That is implanted. I think the difference is we're looking... Removed unless such tissue is implanted. So, I mean, your interpretation is also adding a whole bunch of words that are not in there, and we'd have to find ambiguity to even consider that. I want to answer that question, but I'm not sure I understand it, Your Honor. Can you give me more? I mean, the way I read the regulation versus something being removed and then implanted again. So you're saying that that somehow implies that they're only talking about what the physician intended to implant again? No, no. I'm saying the difference between the government and us is that we acknowledge the HCTP definition is written that it could apply to tissues or cells. So if what you're intending to implant is cells or tissues, what the SSP regulation is really getting at is, is that what... Are you putting that back in from the same patient? I mean, what it's really worried about is, what it's really trying to do is say, we're not going to let you put in cells or tissues from somebody else. That raises a whole host of communicable disease concerns. But if in one procedure, you're doing surgery, you're taking out cells or tissues, you're putting in cells or tissues, it applies. So we're saying it could... I think that you don't dispute that you're taking out tissue. We don't. And we don't dispute that in every surgery, you are taking out more than you are putting back in. You're changing it in some way. And so you need it to be unambiguous that even though you're taking out tissue, you can be intending only to be taking out cells and putting back cells. And maybe you can make an argument that that's a good... Somehow, the better reading, but I don't see how you can say that's the unambiguous reading. Well, again, I think it's, as Judge Bernal found, it's putting the language again with the history and purpose. I mean, I think the history and purpose is really, is as we're saying, really about using the cells or tissues from that patient. It's not about processing. The FDA told us it wasn't about processing or the steps. It told us- But so where in this, I guess I'm not seeing where in this history we get the idea that if you take out tissue, you can still consider it to be putting back cells and that that's all that matters. Well, I think that's where we go back to the concession the government made at SCR 252 that they had this oversight example, but otherwise conceded you can't remove cells without tissue. So if cells mean something, if the repeated use of cells or tissues by the FDA before they enacted the rule means something, it means they were thinking about taking out cells, isolating them and putting back in, whether it's from blood- But given that there is the egg example, I guess I don't see how you can get to it being unambiguous that tissue out and cell in. The egg example, let me be clear. There was a witness who said, I think you can do one. They didn't mention that at deposition. They didn't actually explain the factual basis for that. I mean, what the witness maybe stumbled at in this trial, it's pretty obvious you can take out eggs. And so that could be what the FDA meant. I don't know how that- I don't think there's any evidence about the FDA intending in 1997, when they started writing this regulation, that they meant this to be an egg and tissue rule, which would be particularly odd since there are specific regulations about reproductive cells and tissues. I mean, for example, you are completely exempt if you transfer reproductive tissue between sexually active partners. So I mean, they were thinking. I mean, I think the agency was writing a rule that was, I mean, to be fair, couldn't necessarily anticipate all the things the medical community would come up with to try and do. So I don't think the fact that there may be a limited number of procedures in which you could only extract cells right now means that that regulation unambiguously must contemplate the processing, removal of tissue and the processing of that down to cells. I think it's probably right, Your Honor, that they didn't anticipate where we are today 25 years later. But I think then we're left with two options. One is to interpret the regulation according to the definitions provided, the dictionary definitions of the term, or the other is to, I think what the FDA is really doing is rewriting the regulation without going through notice and comment. I mean, to import the term in its ordinary form, which only allows for these four types of processing into one word such, I think is a weight it cannot bear. And I think that's why the district court said, I'm just gonna give such its dictionary definition. I'm gonna conclude this, the FDA intended to allow both cells or tissues to be the HCTP. And if you do that, then it includes this surgery, really includes all surgeries where, now there is a limiting principle, which we acknowledge, that may not be met in other cases like this, right? The cell has to be the same biologically unaltered cell that was removed. And that was, again, the sort of focus of the trial. So it may be that cells are altered in some meaningful way in other surgeries. And I mean, the 11th Circuit clearly disagreed and found that the regulation considered all the things we're supposed to consider was unambiguous in favor of the FDA's interpretation. I think for you to avoid even what the district court decision that preceded the 11th Circuit's decision, which essentially reached our deference, right? You'd have to say that the regulation unambiguously means what you think it means. But what if we think it's ambiguous? How do you deal with the our deference? Sure. So turning to our deference, Your Honor, I don't think the government meets any of the three criterion for our deference. I think we've talked about the first element, and I think your question presupposes I'm wrong on that, about it being genuinely ambiguous after going through all the canons of construction. But I will note, I don't, beyond the sort of question, the questions I've been asked, which is sort of what was the FDA's intent originally, I don't think the FDA has a good answer to the canons of construction arguments we make in terms of their interpretation violates several canons. But putting that aside, so the interpretation has to be reasonable, which the Supreme Court has said sort of means within the zone of ambiguity that's created. I think our basic point there is, again, that to the extent, HTTP is already defined, so I'm not sure how much ambiguity is in that, but such is not defined. I think our basic point, as I've already said, is to the extent that term is ambiguous, to import these processing in its ordinary form requirements is really a rewriting rather than an interpretation. And then in terms of the authoritativeness,  for the proposition that the government can sort of disclaim the authoritativeness of the document it's seeking to rely upon. And Exelon was a case involving the nuclear, I'll just give the background, because I think it's analogous. The Nuclear Regulatory Commission had a manual that they said was not binding and they didn't expect their licensees to commit to using it. And the Seventh Circuit said, you've sort of taken away the authoritative gloss of that document. And our point is the 27 guidance document is what they're seeking deference to, and that document says it's not binding, creates no responsibilities on us or you. These are only recommendations. So I don't think there's much daylight between those two scenarios. In Exelon, the regulation explicitly said, other than a written interpretation by the general counsel, and that wasn't what the thing was. We don't have anything as expressed as that in this regulation. Well, we do have a statute that the government relies on that I think actually hurts them, which talks about Congress telling the Secretary they can't create or confer any rights on people through these guidance documents. I mean, I think in a way that's Congress saying, you can issue guidance documents, but they're not gonna be sort of authoritative on these issues. Well, they don't get Chevron deference, I guess, but is there any doubt that this is the FDA's position on this issue such that we could look at it for our deference? Well, I don't think it's a question that it's the FDA's position. I think it is. But I think our point is simply that under Exelon, if they sort of say this is just the recommendations, you don't have to follow it, there's sort of an unfair surprise element to it in then saying, this gets deference later on. Is there anything in the record about how prevalent this process is now? Across the United States? Not that I can recall, Your Honor. There was testimony, Judge Wardlaw, about how often these physicians have done the practice, but not had the prevalence of it across the United States. Any further questions from the panel? Thank you, Your Honor. Thank you. Mr. Jed. Just a few quick points, Your Honors. First, my friend tried to, I think, make some hay of the kind of intended for implantation clause at the end of the sentence in the same surgical procedure exception. I just want to make sure that this doesn't get confused. That modifier at the end, intended for implantation, applies to, it's basically saying that if you remove something where there's then kind of something in it that you intend for implantation, then it counts as an HCTP. So I just want to make sure, because in district court, my friends had made some argument that maybe definitionally adipose wasn't an HCTP in the first place, because the modifier wouldn't apply. And I don't think that's what they're saying here, but I do just want to make sure that that hasn't gotten confused. Well, I think what they're saying, or at least what I understand they're saying, is that in the definition of what HCTPs are, that they're cells or tissues. So that frees us to look at the adipose tissue as opposed to the cell that are intended for implantation. And they're using that language to say, because the doctor intends for implantation only the cells and not the tissue, that it doesn't, it's not, it satisfies the same procedure exception. Well, so remember, we're looking at that definition of HCTP. And so if they were saying, and I don't think this is what they're saying, this certainly isn't what the district court was saying, but if they were saying that by definition, the adipose is not an HCTP because the only intent was to return the cells, not only is that not what the district court said, but more to the point, it says consisting of or containing cells that are intended for implantation. So that modifier at the end, just under the rule of the last man to seed it, sort of applies to anything, as long as they're kind of components that are intended for implantation. On their other definitional argument, their surplus fluidity argument. I mean, as an initial matter, as we point out, because the definition is meant to apply to this entire regulatory structure, even were the word cell superfluous as applied to one particular subsection that wouldn't create a surplus fluidity problem. But I do just want to flag, I think a number of questions from the panel were pointing out, look, this was obviously meant to address an area of evolving science. And you don't have to take my word for it or to sort of take the obvious conclusion from a regulatory structure that addresses tissues and cells. If you look at, I think it's page eight of the 1997 proposed approach, there FDA makes clear that one of the points is to develop a framework that will operate as science continues to evolve. Finally, I just want to briefly talk about the issue of our and Kaiser deference. I took my friend as an initial matter to be saying that somehow because FDA didn't anticipate this development of science, that therefore they would have to amend the regulation. I mean, I think it's sort of black letter law and Kaiser spells this out pretty clearly that as new unanticipated things come up where Kaiser deference is appropriate, the agency applies its expertise and sort of figures out how that maybe undeveloped fact kind of slots into the relevant regulation. The Supreme Court in Kaiser actually gives an example of trying to bring truffle paste through a security checkpoint at an airport and whether truffle paste is a liquid, probably something that the TSA didn't think too hard about when they devised those initial regulations. But nonetheless, it's a sort of policy expertise driven consideration that FDA had to apply to those facts. My friend's other main argument is just that FDA are not surgery experts. Obviously, this sort of depends on his idea that a lot of this seems like surgery. But I just want to sort of step back for a moment and say, I take the point of the same surgical procedure exception to be if you are creating something that is entirely new, and then you're going to inject it into a patient. At that point, FDA no longer thinks of it as surgery. The whole point of the statutory framework is if you create something new, as these folks do, and then you mark it as a cure for a bunch of disease, then you have to go through the normal steps for getting FDA assurance of safety and efficacy. And just in case this has gotten confused in Judge Wardlaw, I think this may answer one of your questions as well. We're not saying that they can never manufacture or create this. All that we're saying is that they have to go through some of the relevant steps. Judge Wardlaw, the district court record actually includes a discussion by an FDA official about the fact that there are pending investigational new drug applications for products like this one. If your honor is interested in extra record material, I can tell you that there are a number of pending and actually in effect INDAs. And although the content of INDAs is not really confidential, if your honor Googles, you can actually find some companies that have issued press releases announcing that. Sorry, could I ask just one more question? I know we're over the time, but if we were to agree with you in reverse, and I don't know if we're going to do that, but if we were, are there issues that still need to be resolved? Like, do we need to give any instructions to the district court? What is going on procedurally at that point? So I think it would effectively be a vacate and remand. So obviously the district court issued judgment against the government based on its two main conclusions that none of the products at issue are drugs and that the same surgical procedure exception applies. So I think essentially this court would need to say that both of those are wrong and send those back. Although we think that whether these things are adulterated or misbranded is kind of approaching the level of legal conclusion. It does depend at least a little bit on some facts that were put on in trial, because you of course do need to actually know how the thing is manufactured, what's put on it. And although I suppose it might be theoretically possible on the existing record for this court just to straight out reverse, you know, that's not what we've asked for. I think it would go back before the district court to make those conclusions in the first instance. And it would go back to your request for an injunction. That's correct. And what scope that should have or anything. All of that would be for the district court. That's correct. Unless the court has any other questions. All right. Thank you very much, both counsel. Excellent argument. U.S. versus California Stem Cell Treatment Center is submitted and the session of the court is adjourned for today. Thank you. All rise. This court for this session stands adjourned.
judges: WARDLAW, FRIEDLAND, SUNG